# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
NOBLE CAPITAL LLC,                                    :
                                                      :
                  *Plaintiff*,                        :
                                                      :
            v.                                        :        Civil Action No. 23-cv-3139 (DLF)
                                                      :
THE PEOPLE'S REPUBLIC OF CHINA,                       :
                                                      :
                  *Defendant*.                        :
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SECOND AMENDED COMPLAINT

Noble Capital LLC alleges as follows:

## NATURE OF ACTION

1.     This civil action is brought against the People's Republic of China (the "***PRC***") under the Foreign Sovereign Immunities Act.  This action is based upon recent commercial activity by the PRC in selling billions of dollars of sovereign bonds to public investors in the United States in breach of continuing covenant obligations owed by the PRC under certain outstanding sovereign bonds issued by the predecessor governments of China.

2.     Under the successor government doctrine, a foreign state remains liable for the repayment of sovereign debt for money borrowed by its predecessor governments.  In breach of the successor government doctrine, and under the dominion and control of the Chinese Communist Party, the PRC has repudiated and continues to repudiate its sovereign debts for money borrowed by its predecessor governments, the Republic of China and the Imperial Government of China.

3.     In  October 2017, the PRC revived its international debt issuance program to establish a United States dollar interest rate curve as a benchmark for Chinese state-owned

enterprises to raise funds in foreign currencies.  Pursuant to this program, the PRC issued dollar-denominated bonds on the Hong Kong Exchange under SEC Regulation S, which does not require registration in the United States provided that there are no directed selling efforts in the United States.  Accordingly, United States investors were specifically excluded and not permitted to purchase those bonds.  In October 2018 and October 2019, the PRC issued additional similar bonds.  The bonds issued by the PRC over this three-year period (2017-19) totaled $9 billion, none of which were issued or sold to United States investors.

4.      In October 2020, the PRC changed course.  It expanded its international debt program to include the issuance of dollar-denominated bonds on the Hong Kong Exchange under SEC Rule 144A (the "***Rule 144A Bonds***"), which permits the offer and sale based on directed selling efforts in the United States.  The Rule 144A Bonds issued by the PRC in October 2020 and October 2021 totaled $10 billion, of which approximately $4.7 billion was sold to United States investors.

5.      The issuance and sale of the Rule 144A Bonds by the PRC had two consequences.  ***First***, it breached certain continuing covenant obligations owed by the PRC under the predecessor sovereign bonds that are the subject of this action.  ***Second***, it constituted commercial activity in the United States giving rise to jurisdiction under the Foreign Sovereign Immunities Act for breach of contract claims against the PRC based upon this activity.

6.      For its relief, Noble Capital LLC ("***Noble Capital***") seeks judgment against the PRC for breach of contract damages in an amount to be determined at trial, but not less than $11.5 billion.

## PARTIES

7.      Noble Capital LLC, is a limited liability company organized and existing under the laws of the State of Delaware and the assignee and lawful owner of sovereign bonds sold to the

public by (a) the Imperial Government of China pursuant to the 4½% Gold Loan of 1898, (b) the Imperial Government of China pursuant to the 5%-4 ½% Gold Loan of 1908, (c) the Imperial Government of China pursuant to the 5% Gold Loan of 1911, (d) the Republic of China pursuant to the 5% Gold Loan of 1912 and (e) the Republic of China pursuant to the 5% Gold Loan of 1913 (collectively, the "***Gold Loan Bonds***").

8.      The People's Republic of China is a foreign state within the meaning of 28 U.S.C. § 1603, the recognized government having authority and jurisdiction over mainland China, the successor government to the Republic of China and the Imperial Government of China and successor to the sovereign debt obligations of the Republic of China and the Imperial Government of China.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this breach of contract action, pursuant to 28 U.S.C. §§ 1330(a) and 1605(a)(1), because the PRC has explicitly waived immunity with respect to any actions "arising out of or in connection with" the Rule 144A Bonds.

10.      The Court has subject matter jurisdiction over this breach of contract action, pursuant to 28 U.S.C. §§ 1330(a) and 1605(a)(2), because this action is based upon commercial activity carried on in the United States by the PRC in issuing and selling the Rule 144A Bonds to public investors in the United States.

11.      The Court has subject matter jurisdiction over this breach of contract action, pursuant to 28 U.S.C. §§ 1330(a) and 1605(a)(2), because this action is based upon an act performed in the United States (selling the Rule 144A Bonds to public investors in the United States) in connection with commercial activity of the PRC elsewhere (issuing the Rule 144A Bonds on the stock exchange of Hong Kong).

12.     The Court has personal jurisdiction over the PRC with respect to this breach of contract action, pursuant to 28 U.S.C. § 1330(b), because the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1605 and service was made on the PRC under 28 U.S.C. § 1608(a)(4).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4).

## FACTUAL ALLEGATIONS

### Predecessor Sovereign Bonds

14.      The Imperial Government of China and the Republic of China borrowed money to finance certain (a) war indemnities, (b) government functions and reorganizations and (c) railroads.  This money was borrowed directly from certain European and United States banks (bi-lateral or syndicate), which advanced money pursuant to the terms of fully-negotiated, loan agreements and then reimbursed those advances through the contemporaneous sale of sovereign bonds payable by the government of China, with interest, in certain gold-backed foreign currencies to public investors in Europe and the United States.

15.     Documentation with respect to the Gold Loan Bonds includes the applicable loan agreements and the bearer bonds, each of which contains a unique serial number.

16.     The loan agreements with respect to the Gold Loan Bonds provide for repayment security from two primary sources.  First, the bonds are secured by a pledge of the good faith and credit of the government of China, backed by its plenary power of taxation and memorialized in an unconditional guaranty (the "***Security Guaranty***").  Second, the bonds are further secured by a charge on the assignment of certain specified future revenue of the government of China (the "***Security Charge***").

17.     In order to preserve the repayment protections provided by the foregoing security, the loan agreements contain certain affirmative and negative covenants.  The affirmative covenants

provide that (a) the loan shall have priority over all future loans secured by a charge on the specified future revenue (the "***Priority Clause***") and (b) all future loans secured by a charge on the specified revenue shall be subject to the current loan (the "***Seniority Clause***").  The negative covenants provide that (a) no future loan shall be raised that shall take precedence of or be on an equality with the current loan (the "***Precedence Clause***") and (b) no future charge shall lessen or impair the security of the current loan over the specified future revenue (the "***Non-Impairment Clause***").

18.    True and correct extracts from the applicable loan agreements with respect to the foregoing security provisions and affirmative and negative covenants are set forth in **Exhibit A** attached hereto and incorporated as if fully restated herein.

19.    As further alleged below, the PRC has repudiated and continues to repudiate its sovereign debts for money borrowed by its predecessor governments, including the Gold Loan Bonds, with the consequent effect that all sovereign debt raised by the PRC shall take precedence of the Gold Loan Bonds.  As further alleged below, because the Precedence Clause prohibits the PRC from raising future debt that shall take precedence of the Gold Loan Bonds, each issuance of sovereign bonds by the PRC, including issuance of the Rule 144A Bonds, constitutes a separate breach of the continuing covenant obligations owed by the PRC under the Precedence Clause and gives rise to a separate breach of contract claim against the PRC.

20.    The Gold Loan Bonds for which Noble Capital is the assignee and lawful owner, that are the subject of this action, are due and payable in an amount to be determined at trial, but not less than $11.5 billion, as summarized in **Exhibit B** attached hereto and hereby incorporated as if fully restated herein.

**Predecessor Governments**

21.    Prior to 1912, the Imperial Government of China was the recognized government

with authority and jurisdiction over China.

22.    On January 1, 1912, the Republic of China was established as the successor government to the Imperial Government of China, with authority and jurisdiction over China, and successor to the sovereign debt obligations of the Imperial Government of China, including certain of the Gold Loan Bonds.

23.    Through and including September 1, 1938, the Republic of China continued to issue sovereign bonds and generally to make all interest and principal payments when due on such bonds, including the Gold Loan Bonds.  (The Republic of China suspended the payment of interest and principal on the German portion of certain sovereign bonds in July 1920 and resumed payment in July 1924.)

24.    On March 1, 1939, the Republic of China defaulted on its payment obligations, as a result of the ongoing second Sino-Japanese war, and thereafter remained in default on its sovereign bonds, including the Gold Loan Bonds.

25.    On August 13, 1947, following the end of World War II, the Republic of China issued a statement reaffirming its obligations under its existing sovereign debts, including the Gold Loan Bonds, and stated:

> China pledges her honourable intention to repay those external loans the service of which was suspended in the course of the Sino-Japanese war.  In no way does the conclusion of new loans in recent years prejudice the security of these pre-war loans or vitiate the rights of holders of such bonds.

*Statement of the Prime Minister of the Republic of China*.

26.    On October 1, 1949, the Chinese Communist Party seized control of mainland China and established the PRC as the successor government to the Republic of China, with authority and jurisdiction over mainland China, and successor to the sovereign debt obligations of the Republic of China and the Imperial Government of China, including the Gold Loan Bonds.

27.    The Chinese Communist Party exercises dominion and control over the PRC and tasks the PRC with operating a powerful and expansive administrative state.  At every level and in every institution, party rank takes precedence over government rank.

28.    The PRC is organized with only one branch of government, based on the principle of unified state power, in which the National People's Congress of the People's Republic of China (the "***NPC***") is the highest organ of state power.  The PRC has no branch of political power separate from the NPC and the legislative, executive and judicial powers of the PRC are established in the NPC.  The state organs of the PRC have no separate powers other than those granted to them by the NPC.

29.     The Central People's Government of the People's Republic of China, also known as the State Council of the People's Republic of China (the "***Central People's Government***" or the "***State Council***"), is the executive body of the NPC and the highest institution of government administration.

30.    The Ministry of Finance of the People's Republic of China (the "***Ministry of Finance***") is one of the governmental bodies that form the State Council.  The Ministry of Finance is responsible for administering all external borrowings by the Central People's Government on behalf of the PRC.

## Repudiation of Gold Loan Bonds

31.    Unlike its predecessor governments, the PRC did not continue to issue or make payments on its sovereign debts for money borrowed by its predecessor governments.  Instead, the PRC has refused and continues to refuse to make payments on the sovereign bonds issued by the predecessor governments of China, including the Gold Loan Bonds.

32.    On February 20, 1953, the PRC formally repudiated its sovereign debt obligations,

including the Gold Loan Bonds, and stated:

> With respect to the public bonds issued by the former Chinese governments . . . and so on, issued by the reactionary government of Kuomintang (KMT) through its Gold Loan Banks and trust bureaus, are deemed as public bonds, and will not be repaid.

Administrative Council of the People's Republic of China, *Measure for Repayment of Unsettled*

*Deposits in Before Liberation* at § 16.

33.    On August 26, 1955, the PRC again formally repudiated its sovereign debt

obligations, including the Gold Loan Bonds, and stated:

> We agree with the opinion of the Ministry of Finance, that the PRC government will not repay any of the public bonds issued by the Beiyang government and the Nationalist government.

Office of State Council, *Reply WU BAN ZI (55) No. 61*.

34.    On January 18, 1982, the PRC again formally repudiated its sovereign debt

obligations, including the Gold Loan Bonds, and stated:

> In recent years, a number of foreign individuals and organizations holding public bonds issued by the former Chinese governments have written to Chinese embassies consulates and financial institutions, inquiring about the value of such bonds, whether or not our government would repay for such bonds, and repayment procedure.  Some of them have even claimed for compensation.

> With respect to the public bonds issued by the former Chinese governments, Provision Sixteen in the "Measure for Repayment of Unsettled Deposits in Banks Before Liberation" as promulgated on February 20, 1953 by the previous Government Administrative Council of the P.R.C. stipulates: [specific bonds] and so on, issued by the reactionary government of Kuomintang (KMT) through its banks and trust bureaus, are deemed public bonds, and will not be repaid."  The 5th Office of the State Council once issued a Reply (WU BAN ZI (55) No. 61) on August 26, 1955, stating: "We agree with the opinion of the Ministry of Finance, that the PRC government will not repay any of the public bonds issued by the Beiyang government and the Nationalist government."

> As a result, from now on, any questions being raised by foreign individuals or organizations relating to the above-mentioned bonds shall be replied appropriately in this discretion, and the cases shall be reported in writing to the Ministry of Finance and the Ministry of Foreign Affairs.  The above principles shall also apply to overseas Chinese holding public bonds issued by the former Chinese governments.

Ministry of Finance of the People's Republic of China and Ministry of Foreign Affairs of the

People's Republic of China, *Notice on Resolving Problems of Public Bonds Issued by the Former Chinese Governments*.

35.    On February 9, 1983, the PRC again formally repudiated its sovereign debt obligations, including the Gold Loan Bonds, and stated:

> The Chinese Government recognized no external debts incurred by the defunct Chinese governments and has no obligation to repay them.  This has been the consistent position of the Chinese Government.

People's Republic of China, *Aide Memoire of the Ministry of Foreign Affairs*.

36.    On June 5, 1987, in exchange for access to the capital markets of the United Kingdom, the PRC entered into a treaty with the United Kingdom and selectively reaffirmed certain of its obligations with respect to sovereign bonds issued by its predecessor governments, the Republic of China and the Imperial Government of China.  Pursuant to this treaty, the PRC agreed to pay £23.5 million to the United Kingdom in settlement of claims held by British nationals against the PRC for sovereign bonds issued by the predecessor governments or property expropriation by the PRC.  *Agreement between the Government of the United Kingdom of Great Britian and Northern Ireland and the Government of the People's Republic of China Concerning the Settlement of Mutual Historical Property Claims*, Treaty Series No. 37 (1987).

### Rule 144A Bonds

37.    In October 2017, the PRC revived its international debt issuance program to establish a United States dollar interest rate curve as a benchmark for Chinese state-owned enterprises to raise funds in foreign currencies.  Pursuant to this program, the PRC issued dollar-denominated bonds on the Hong Kong Exchange under Security Exchange Commission (the "**_SEC_**") Regulation S, which does not require registration in the United States provided that there are no "directed selling efforts" in the United States.  These bonds were sold to public investors globally, although United States investors were specifically excluded and not permitted to

purchase those bonds.  In October 2018 and October 2019, the PRC issued additional similar bonds.  The bonds issued on behalf of the PRC over this three-year period (2017-19) totaled $9 billion, none of which were issued or sold to United States investors.

38.    In October 2020, the PRC changed course.  It expanded its international debt program to include the issuance of dollar-denominated bonds on the Hong Kong Exchange under SEC Rule 144A (*i.e.*, the "***Rule 144A Bonds***"), which permits the offer and sale based on "directed selling efforts" in the United States, provided that the securities are offered and sold only to United States investors that constitute "qualified institutional investors."  These bonds were sold to public investors globally, specifically including qualified United States investors.  The Rule 144A Bonds issued on behalf of the PRC in October 2020 and October 2021 totaled $10 billion, of which approximately $4.7 billion was sold to United States investors.

39.    The Rule 145A Bonds were issued by the Ministry of Finance on behalf of the Central People's Government and the PRC and are a principal component of the PRC's external indebtedness.

40.    The Rule 144A Bonds provide that they are secured by a pledge of the full faith and credit of the Central People's Government and will rank *pari passu* with all unsecured debt issued by the Central People's Government on behalf of the PRC:

> The full faith and credit of the Central People's Government of the People's Republic of China (the "Central People's Government") is pledged for the due and punctual payment of the Bonds and for the due and timely performance of all obligations of the Central People's Government with respect thereto.
>
> The Bonds are the direct, unconditional  and unsecured obligations of the Central People's Government and rank and will rank *pari passu*, without preference among themselves, with all other unsecured Public Indebtedness of the Central People's Government, from time to time outstanding, provided further, that the Central People's Government shall have no obligation to effect equal or ratable payment(s) at any time with respect to any such other Public Indebtedness and, in particular, shall have no obligation to pay other Public Indebtedness at the same time or as a condition of payment sums due on the [Rule 144A]

Bonds and *vise versa*.

*E.g., Offering Circular of the Central People's Government of The People's Republic of China Bonds*, dated October 27, 2021 ("***Offering Circular 2021***") at Terms and Conditions of the Bonds, ¶ 3 (Status of Bonds).

41.     Pursuant to the Rule 144A Bonds, the PRC effectively repudiated the Gold Loan Bonds by omitting any reference to PRC's successor liability with respect to the Gold Loan Bonds in the Offering Circulars.  *E.g., Offering Circular 2021* at p.73 ("Debt Record[.]  The central government has always paid when due the full amount of principal of, any interest and premium on, and any amortization or sinking fund requirements of, external and internal indebtedness incurred by it since the PRC was founded in 1949.").

42.     The Rule 144A Bonds provide that all payments will be made either (i) without any withholding for taxes assessed by or on behalf of the PRC, or any political subdivision or any authority thereof, or (ii) with the payment of such withholding to be made by the Ministry of Finance.  *E.g., Offering Circular 2021* at Terms and Conditions of the Bonds, ¶ 7 (Taxation and Withholding).

43.     The Rule 144A Bonds provide for the waiver of immunity by the Ministry of Finance, on behalf of the Central People's Government and the PRC, with respect to any action "arising out of or in connection with" the Rule 144A Bonds. *E.g., Offering Circular 2021* at Terms and Conditions of the Bonds, ¶ 16(d) (Waiver of Immunity).

### Rule 144A Bonds (2020)

44.     On October 22, 2020, following directed selling efforts in the United Sates targeting United States investors, the Ministry of Finance, on behalf of the Central People's Government and the PRC, issued $6 billion of United States dollar-denominated Rule 144A Bonds (the "***Rule 144A Bonds (2020)***") to public investors in the United States and globally, of which approximately

47% was subscribed by and a substantial portion was sold to public investors in the United States.

45.    The Rule 144A Bonds (2020) were underwritten by several prominent United States banks and are payable in the United States.

46.    An International Securities Identification Number (the "***ISIN***") was assigned to each Rule 144A Bonds (2020) series evidenced by restricted global certificates.  Each ISIN assigned to a publicly traded bond contains twelve characters, the first two characters of which indicate the country in which funds will be deposited.  "US" indicates that funds will be deposited in the United States.  The first two characters of each ISIN assigned to each of the Rule 144A Bonds (2020) series was "US."

47.    In each April and October subsequent to issuance of the Rule 144A Bonds (2021), the PRC caused funds to be deposited with its paying agent, Deutsche Bank Trust Company Americas located at 60 Wall Street, 24th Floor, New York, New York, for the benefit of holders of the Rule 144A Bonds (2020), and its agent in turn paid those funds directly to holders of the Rule 144A Bonds (2020) in the United States and globally on (i) April 22, 2021, (ii) October 22, 2021, (iii) April 22, 2022, (iv) October 22, 2022, (v) April 22, 2023, (vi) October 22, 2023, (vii) April 22, 2024 and (viii) October 22, 2024.

## Rule 144A Bonds (2021)

48.    On October 27, 2021, following additional directed selling efforts in the United States targeting United States investors, the Ministry of Finance, on behalf of the Central People's Government and the PRC, issued $4 billion of United States dollar-denominated Rule 144A Bonds (the "***Rule 144A Bonds (2021)***") to public investors in the United States and globally, of which a substantial portion was subscribed by and sold to public investors in the United States.

49.    The Rule 144A Bonds (2021) were underwritten by several prominent United

States banks and are payable in the United States.

50.     The ISIN assigned to the Rule 144A Bonds (2021) series evidenced by restricted global certificates are (i) US60367QAA13 (bonds due 2024), (ii) US60367QAB95 (bonds due 2026), (iii) US60367QAC78 (bonds due 2031) and (iv) US60367QAD51 (bonds due 2051).

51.     In each April and October subsequent to issuance of the Rule 144A Bonds (2021), the PRC caused funds to be deposited with its paying agent, Deutsche Bank Trust Company Americas located at 60 Wall Street, 24th Floor, New York, New York, for the benefit of holders of the Rule 144A Bonds (2021), and its agent in turn paid those funds directly to holders of the Rule 144A Bonds (2021) in the United States and globally on (i) April 26, 2022, (ii) October 26, 2022, (iii) April 26, 2023, (iv) October 26, 2023, (v) April 26, 2024 and (vi) October 26, 2024.

**COUNT I**
**BREACH OF CONTRACT**
(Gold Loan Bonds 1898)

52.      Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

53.     On March 2, 1898, the Imperial Government of China authorized and approved that certain Agreement for the Chinese Imperial  Government 4½% Gold Loan of 1898 (the "***Loan Agreement 1898***") in the amount of £16 million.

54.     Pursuant to Loan Agreement 1898, and the terms and conditions contained therein, the Hongkong and Shanghai Banking Corporation ("***HSBC***") and Deutsche Asiatische Bank ("***Deutsche Bank***") advanced loan proceeds to the government of China in the amount of £13.28 million and, contemporaneously therewith, sold bearer bonds payable by the government of China to public investors in the amount of £16 million (the "***Gold Loan Bonds 1898***").

55.     Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1898 reflect that HSBC and Deutsche Bank received a commission on the loan of 7%

and the Gold Loan Bonds 1898 were sold to the public with an original issue discount of 10%.

56.     Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1898 were to be used for the purpose of paying the balance of a war indemnity owed by the government of China, due May 8, 1898, to the government of Japan.

57.     Gold Loan Bonds 1898 were sold by HSBC, on behalf of the government of China, to public investors in denominations of £25 (1,500 bonds, serial nos. 0001-1,500), £50 (1,500 bonds, serial nos. 0001-1,500), £100 (66,875 bonds, serial nos. 00001-66,785) and £500 (2,400 bonds, serial nos. 0001-2,400).

58.     Gold Loan Bonds 1898 were sold by Deutsche Bank, on behalf of the government of China, to public investors in denominations of £25 (28,500 bonds, serial nos. 1,501-30,000), £50 (58,500 bonds, serial nos. 1,501-60,000), £100 (43,125 bonds, serial nos. 66,786-110,000) and £500 (100 bonds, serial nos. 2,401-2,500).

59.     The Loan Agreement 1898 provides for repayment security from two primary sources.  First, the Gold Loan Bonds 1898 are secured by a pledge of the good faith and credit of the government of China, backed by its plenary power of taxation and memorialized in an unconditional guaranty.  Second, the Gold Loan Bonds 1898 are further secured by a charge on the assignment of certain specified future revenue of the government of China.  Loan Agreement 1898, Art. 6. (extracted in **Exhibit A**).

60.     In order to preserve the repayment protections provided by the foregoing repayment security, the Loan Agreement 1898 contains certain affirmative and negative covenants.  The affirmative covenants provide, *inter alia*, that the loan shall have priority over all future loans (the "***Priority Clause 1898***") and the negative covenants provide, *inter alia*, that no future loan shall be raised that shall take precedence of or be on an equality with the current loan (the "***Precedence***

*__Clause 1898__*").  Loan Agreement 1898, Art. 6 (extracted in __Exhibit A__).

61.    The government of China repaid Gold Loan Bonds 1898 in the principal amount of £8,383,875 and failed to repay Gold Loan Bonds 1898 in the outstanding, unpaid principal amount of £7,616,125.

62.    Noble Capital is the assignee and lawful owner of Gold Loan Bonds 1898 in the outstanding, unpaid principal amount of £7,175.  Noble Capital reserves the right to acquire additional Gold Loan Bonds 1898 and to recover breach of contract damages in this action as the assignee and lawful owner of said sovereign bonds.

63.    The PRC has repudiated and continues to repudiate the Gold Loan Bonds 1898 with the consequent effect that those bonds shall be subordinated to all future bonds issued by the government of China.

64.    On or about October 22, 2020, the PRC breached the Priority Clause 1898 when it issued the Rule 144A Bonds (2020) with a rank that had priority over the Gold Loan Bonds 1898.

65.    On or about October 27, 2021, the PRC breached the Priority Clause 1898 when it issued the Rule 144A Bonds (2021) with a rank that had priority over the Gold Loan Bonds 1898.

66.    The PRC has repudiated and continues to repudiate the Gold Loan Bonds with the consequent effect that all future debt raised by the PRC shall take precedence of the Gold Loan Bonds.

67.    On or about October 22, 2020, the PRC breached the Precedence Clause 1898 when it issued the Rule 144A Bonds (2020) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1898.

68.     On or about October 27, 2021, the PRC breached the Precedence Clause 1898 when it issued the Rule 144A Bonds (2021) because the loan raised thereunder shall take

precedence of the Gold Loan Bonds 1898.

69.     By reason of the foregoing, the PRC breached its continuing contract obligations under the Gold Loan Bonds 1898 and is liable to Noble Capital for breach of contract damages in an amount to be determined at trial, but not less than $85.6 million.

**COUNT II**
**<u>BREACH OF CONTRACT</u>**
(Gold Loan Bonds 1908)

70.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

71.     On October 8, 1908, the Imperial Government of China authorized and approved that certain Agreement for the Board of Posts and Communications, acting for and on behalf of the Imperial Government of China, 5% to 4½% Gold Loan of 1908 (the "***<u>Loan Agreement 1908</u>***") in the amount of £5 million.

72.     Pursuant to the Loan Agreement 1908, HSBC and Banque de l'Indo-Chine ("***<u>Credit Agricole</u>***") advanced loan proceeds to the government of China in the amount of £4.7 million and, contemporaneously therewith, sold bearer bonds payable by the government of China to public investors in the amount of £5 million (the "***<u>Gold Loan Bonds 1908</u>***").

73.     Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1908 reflect that HSBC and Credit Agricole received a commission on the loan of 4% and the Gold Loan Bonds 1908 were sold to the public with an original issue discount of 2%.

74.     Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1908 were to be used for the purpose of redeeming the Peking-Hankow Railway Loan of 1898 in the amount £4 million and the balance allocated to establishing various industries.

75.     Gold Loan Bonds 1908 were sold by HSBC, on behalf of the government of China, to public investors in denominations of £20 (5,000 bonds, serial nos. 24,001-29,000) and £100

(24,000 bonds, serial nos. 00001-24,000).

76.    Gold Loan Bonds 1908 were sold by Credit Agricole, on behalf of the government of China, to public investors in denominations of £20 (125,000 bonds, serial nos. 29,001-154,000).

77.    The Loan Agreement 1908 provides for repayment security from two primary sources.  First, the Gold Loan Bonds 1908 are secured by a pledge of the good faith and credit of the government of China, backed by its plenary power of taxation and memorialized in an unconditional guaranty.  Second, the Gold Loan Bonds 1908 are further secured by a charge on the assignment of certain specified future revenue of the government of China.  Loan Agreement 1908, Art. 7 (extracted in **Exhibit A**.)

78.     In order to preserve the repayment protections provided by the foregoing repayment security, the Loan Agreement 1908 contains certain affirmative and negative covenants. The negative covenants provide, *inter alia*, that no future loan shall be raised that shall take precedence of or be on an equality with the current loan (the "***Precedence Clause 1908***").  Loan Agreement 1908, Art. 7 (extracted in **Exhibit A**).

79.    The government of China repaid Gold Loan Bonds 1908 in the principal amount of £4,750,000 and failed to repay Gold Loan Bonds 1908 in the outstanding, unpaid principal amount of £250,000.

80.     Noble Capital is the assignee and lawful owner of Gold Loan Bonds 1908 in the outstanding, unpaid principal amount of £5,520.  Noble Capital reserves the right to acquire additional Gold Loan Bonds 1908 and to recover breach of contract damages in this action as the assignee and lawful owner of said sovereign bonds.

81.    The PRC has repudiated and continues to repudiate the Gold Loan Bonds with the consequent effect that all future debt raised by the PRC shall take precedence of the Gold Loan

Bonds.

82.     On or about October 22, 2020, the PRC breached the Precedence Clause 1908 when it issued the Rule 144A Bonds (2020) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1908.

83.     On or about October 27, 2021, the PRC breached the Precedence Clause 1908 when it issued the Rule 144A Bonds (2021) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1908.

84.     By reason of the foregoing, the PRC breached its continuing contract obligations under the Gold Loan Bonds 1908 and is liable to Noble Capital for breach of contract damages in an amount to be determined at trial, but not less than $76.5 million.

## COUNT III
## BREACH OF CONTRACT
(Gold Loan Bonds 1911)

85.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

86.     On May 20, 1911, the Imperial Government of China authorized and approved that certain Final Agreement for the Hukuang Imperial Government Railways 5% Loan of 1911 (the "***Loan Agreement 1911***") in the amount of £6 million.

87.     Pursuant to Loan Agreement 1911, and the terms and conditions contained therein, HSBC, Deutsche Bank, Credit Agricole and J.P. Morgan & Company, Kuhn, Loeb & Company, The First National Bank and The National City Bank of New York (collectively, the "***American Group***") advanced loan proceeds to the government of China in the amount of £4.7 million and, contemporaneously therewith, sold bearer bonds payable by the government of China to public investors in the amount of £6 million (the "***Gold Loan Bonds 1911***").

88.     Loan proceeds advanced to the government of China pursuant to the Loan

Agreement 1911 reflect that HSBC, Deutsche Bank, Credit Agricole and the American Group received a commission on the loan of 5% and the Gold Loan Bonds 1911 were sold to the public with an average original issue discount of approximately 16.7%.

89.    Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1911 were to be used for the purpose of redeeming certain outstanding bonds and the balance allocated to constructing certain railway lines.

90.    Gold Loan Bonds 1911 were sold by HSBC to public investors in denominations of £20 (2,500 bonds, serial nos. 0001-2,500) and £100 (14,500 bonds, serial nos. 70,151-84,650).

91.    Gold Loan Bonds 1911 were sold by Deutsche Bank to public investors in denominations of £20 (30,000, serial nos. 2,501-32,500) and £100 (9,000 bonds, serial nos. 84,651-93,650).

92.    Gold Loan Bonds 1911 were sold by Credit Agricole to public investors in the denomination of £20 (37,500 bonds, serial nos. 32,501-70,000) and £100 (7,500 bonds, serial nos. 93,651-101,150).

93.    Gold Loan Bonds 1911 were sold by the American Group to public investors in the denomination of £20 (150 bonds, serial nos. 70,001-70,150) and £100 (14,970 bonds, serial nos. 101,151-116,120).

94.    The Loan Agreement 1911 provides for repayment security from two primary sources.  First, the Gold Loan Bonds 1911 are secured by a pledge of the good faith and credit of the government of China, backed by its plenary power of taxation and memorialized in an unconditional guaranty.  Second, the Gold Loan Bonds 1911 are further secured by a charge on the assignment of certain specified future revenue of the government of China.  Loan Agreement 1911, Art. VIII and IX (extracted in **Exhibit A**).

95.     In order to preserve the repayment protections provided by the foregoing repayment security, the Loan Agreement 1911 contains certain affirmative and negative covenants.  The negative covenants provide, *inter alia*, that no future loan shall be raised that shall take precedence of or be on an equality with the current loan (the "***Precedence Clause 1911***").  Loan Agreement 1911, Art IX (extracted in **Exhibit A**).

96.     The government of China repaid Gold Loan Bonds 1911 in the principal amount of £5,274,180 and failed to repay Gold Loan Bonds 1911 in the outstanding, unpaid principal amount of £725,820.

97.     Noble Capital is the assignee and lawful owner of Gold Loan Bonds 1911 in the outstanding, unpaid principal amount of £461,860.  Noble Capital reserves the right to acquire additional Gold Loan Bonds 1911 and to recover breach of contract damages in this action as the assignee and lawful owner of said sovereign bonds.

98.     The PRC has repudiated and continues to repudiate the Gold Loan Bonds with the consequent effect that all future debt raised by the PRC shall take precedence of the Gold Loan Bonds.

99.     On or about October 22, 2020, the PRC breached the Precedence Clause 1911 when it issued the Rule 144A Bonds (2020) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1911.

100.    On or about October 27, 2021, the PRC breached the Precedence Clause 1911 when it issued the Rule 144A Bonds (2021) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1911.

101.    By reason of the foregoing, the PRC breached its continuing contract obligations under the Gold Loan Bonds 1911 and is liable to Noble Capital for breach of contract damages in

an amount to be determined at trial, but not less than $9.7 billion.

**COUNT IV**
**BREACH OF CONTRACT**
(Gold Loan Bonds 1912)

102.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

103.     On July 14, 1912, and by special order dated September 2, 1912, the Republic of China authorized and approved that certain Agreement for the Chinese Government 5% Gold Loan of 1912 dated August 30, 1912 (the "***Loan Agreement 1912***") in the amount of up to £10 million.

104.     Pursuant to Loan Agreement 1912, and the terms and conditions contained therein, G. Birch Crisp & Company of London (the "***Crisp Financial Group***") advanced loan proceeds to the government of China in the amount of £4.45 million and, contemporaneously therewith, sold bearer bonds payable by the government of China to public investors in the amount of £5 million (the "***Gold Loan Bonds 1912***").

105.     Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1912 reflect that the Crip Financial Group received a commission on the loan of 6% and the Gold Loan Bonds 1912 were sold to the public with an original issue discount of 5%.

106.     Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1912 were to be used for the purpose of redeeming certain existing loans, reorganizing certain government functions and funding certain productive works.

107.     Gold Loan Bonds 1912 were sold by the Crisp Financial Group to public investors in denominations of £20 (32,500, serial nos. 0001-22,500), £100 (26,000, serial nos. 0001-26,000), £500 (2,000 bonds, serial nos. 0001-2000) and  £1,000 (750 bonds, serial nos. 001-750).

108.     The Loan Agreement 1912 provides for repayment security from two primary sources.  First, the Gold Loan Bonds 1912 are secured by a pledge of the good faith and credit of

the government of China, backed by its plenary power of taxation and memorialized in an unconditional guaranty. Second, the Gold Loan Bonds 1912 are further secured by a charge on the assignment of certain specified future revenue of the government of China. Loan Agreement 1912, Art. IV (extracted in **Exhibit A**).

109.    In order to preserve the repayment protections provided by the foregoing repayment security, the Loan Agreement 1912 contains certain affirmative and negative covenants. The negative covenants provide, *inter alia*, that no future loan shall be raised that shall take precedence of or be on an equality with the current loan (the "***Precedence Clause 1912***"). Loan Agreement 1912, Art IV (extracted in **Exhibit A**).

110.    The government of China repaid Gold Loan Bonds 1912 in the principal amount of £4,114,240 and failed to repay Gold Loan Bonds 1912 in the outstanding, unpaid principal amount of £885,760.

111.    Noble Capital is the assignee and lawful owner of Gold Loan Bonds 1912 in the outstanding, unpaid principal amount of £29,160. Noble Capital reserves the right to acquire additional Gold Loan Bonds 1912 and to recover breach of contract damages in this action as the assignee and lawful owner of said sovereign bonds.

112.    The PRC has repudiated and continues to repudiate the Gold Loan Bonds with the consequent effect that all future debt raised by the PRC shall take precedence of the Gold Loan Bonds.

113.    On or about October 22, 2020, the PRC breached the Precedence Clause 1912 when it issued the Rule 144A Bonds (2020) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1912.

114.    On or about October 27, 2021, the PRC breached the Precedence Clause 1912

when it issued the Rule 144A Bonds (2021) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1912.

115.    By reason of the foregoing, the PRC breached its continuing contract obligations under the Gold Loan Bonds 1912 and is liable to Noble Capital for breach of contract damages in an amount to be determined at trial, but not less than $610.1 million.

**COUNT V**
**BREACH OF CONTRACT**
(Gold Loan Bonds 1913)

116.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

117.    On April 22, 1913, the Republic of China authorized and approved that certain Chinese Government 5% Reorganization Gold Loan Agreement dated April 26, 1913 (the "***Loan Agreement 1913***") in the amount of £25 million.

118.    Pursuant to Loan Agreement 1913, and the terms and conditions contained therein, HSBC, Deutsche Bank, Credit Agricole and Russo-Asiatic Bank ("***RAB***") advanced loan proceeds to the government of China in the amount of £21 million and, contemporaneously therewith, sold bearer bonds payable by the government of China to public investors in the amount of £25 million (the "***Gold Loan Bonds 1913***").

119.    Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1913 reflect that HSBC, Deutsche Bank, Credit Agricole and the RAB received a commission on the loan of 6% and the Gold Loan Bonds 1913 were sold to the public with an original issue discount of 10%.

120.    Loan proceeds advanced to the government of China pursuant to the Loan Agreement 1913 were to be used for the purpose of paying certain specified liabilities due by the government of China, redeeming certain provincial loans, paying certain specified liability due

shortly thereafter by the government of China, paying certain estimated administration expenses, paying certain reorganization expenses of the salt administration and additional administrative expenses to be agreed.

121.    Gold Loan Bonds 1913 were sold by HSBC to public investors in denominations of £20 (95,834, serial nos. 0001-95,384) and £100 (55,000, serial nos. 795,001-850,000).

122.    Gold Loan Bonds 1913 were sold by Deutsche Bank to public investors in denominations of £20 (30,000, serial nos. 95,835-215,834) and £100 (36,000, serial nos. 850,001-886,000).

123.    Gold Loan Bonds 1913 were sold by Credit Agricole to public investors in the denomination of £20 (370,833, serial nos. 215,835-586,667).

124.    Gold Loan Bonds 1913 were sold by RAB to public investors in the denominations of ₽189.40 (208,333, serial nos. 586,668-795,000).

125.    The Loan Agreement 1913 provides for repayment security from two primary sources.  First, the Gold Loan Bonds 1913 are secured by a pledge of the good faith and credit of the government of China, backed by its plenary power of taxation and memorialized in an unconditional guaranty.  Second, the Gold Loan Bonds 1913 are further secured by a charge on the assignment of certain specified future revenue of the government of China.  Loan Agreement 1913, Art. III and IV (extracted in **Exhibit A**).

126.    In order to preserve the repayment protections provided by the foregoing repayment security, the Loan Agreement 1913 contains certain affirmative and negative covenants.  The negative covenants provide, *inter alia*, that no future loan shall be raised that shall take precedence of or be on an equality with the current loan (the "***Precedence Clause 1913***").  Loan Agreement 1913, Art. IV (extracted in **Exhibit A**).

127.    The government of China repaid Gold Loan Bonds 1913 in the principal amount of £12,573,620 and failed to repay Gold Loan Bonds 1913 in the outstanding, unpaid principal amount of £12,426,380.

128.    Noble Capital is the assignee and lawful owner of Gold Loan Bonds 1913 in the outstanding, unpaid principal amount of £51,260. Noble Capital reserves the right to acquire additional Gold Loan Bonds 1913 and to recover breach of contract damages in this action as the assignee and lawful owner of said sovereign bonds.

129.    The PRC has repudiated and continues to repudiate the Gold Loan Bonds with the consequent effect that all future debt raised by the PRC shall take precedence of the Gold Loan Bonds.

130.    On or about October 22, 2020, the PRC breached the Precedence Clause 1913 when it issued the Rule 144A Bonds (2020) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1913.

131.    On or about October 27, 2021, the PRC breached the Precedence Clause 1913 when it issued the Rule 144A Bonds (2021) because the loan raised thereunder shall take precedence of the Gold Loan Bonds 1913.

132.    By reason of the foregoing, the PRC breached its continuing contract obligations under the Gold Loan Bonds 1913 and is liable to Noble Capital a for breach of contract damages in an amount to be determined at trial, but not less than $1.1 billion.

**WHEREFORE**, Noble Capital prays for judgment against the PRC as follows:

A. Awarding Noble Capital breach of contract damages with respect to the Gold Loan Bonds 1898 in an amount to be determined at trial, but not less than $85.6 million;

B.  Awarding Noble Capital breach of contract damages with respect to the Gold Loan Bonds 1908 in an amount to be determined at trial, but not less than $76.5 million;

C.  Awarding Noble Capital breach of contract damages with respect to the Gold Loan Bonds 1911 in an amount to be determined at trial, but not less than $9.7 billion;

D.  Awarding Noble Capital breach of contract damages with respect to the Gold Loan Bonds 1912 in an amount to be determined at trial, but not less than $610.1 million;

E.  Awarding Noble Capital breach of contract damages with respect to the Gold Loan Bonds 1913 in an amount to be determined at trial, but not less than $1.1 billion million;

F.   Awarding Noble Capital its costs and attorneys' fees; and

G.  Granting Noble Capital such additional relief as is just and proper.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

Respectfully submitted,

**NOBLE CAPITAL LLC**

Dated: November 19, 2024                 By:\_\_\_/s/ Kenneth Noble_____
                                                   One of Its Attorneys

Jason Rubinstein (D.C. Bar Id. #975008)
Craig Litherland (D.C. Bar Id. #474658)
GILBERT LLP
700 Pennsylvania Ave. SE, Suite 400
Washington, D.C.  2003-2493
Telephone: (202) 772-2200
rubinsteinj@gilbertlegal.com
litherlandc@gilbertlegal.com

            -and-

Charles Forman (D.C. Bar Id. # 316299; *pro hac vice*)
FORMAN HOLT LLP
365 W. Passaic St., Suite 400
Rochelle Park, New Jersey 07662
Telephone: (201) 845-1000
cforman@formanlaw.com

            -and-

Kenneth Noble (*pro hac vice*)
NOBLE LAW PLLC
1185 Avenue of the Americas, 3rd Floor
New York, New York 10036-6805
Telephone: (212) 324-2525
knoble@noblepllc.com